## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Feb 27 2015, 10:05 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS

Jeremy K. Nix
Matheny, Hahn, Denman & Nix, L.L.P.
Huntington, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: D.C., G.C., & S.C., Minor Children,

A.C., Mother, and D.C., Father,

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

February 27, 2015

Court of Appeals Case No.
90A02-1408-JT-599

Appeal from the Wells Circuit Court

The Honorable Kenton W. Kiracofe, Judge

Cause Nos: 90C01-1401-JT-2; 90C01-1401-JT-3; 90C01-1401-JT-4

**Brown, Judge.**

[1] A.C. ("Mother") and D.C. ("Father," and together with Mother, "Parents") appeal the involuntary termination of their parental rights with respect to their children, S.C., G.C., and D.C. (collectively, the "Children"). Parents raise one issue, which we revise and restate as whether the trial court's findings support the court's decision to terminate their parental rights. We affirm.

## Facts and Procedural History

[2] Parents are an unmarried couple who have been together for eleven years, and have struggled with methamphetamine use for many years. Their Children, D.C. and G.C., were born on May 14, 2003, and S.C. was born on January 18, 2007. D.C. and G.C. have cerebral palsy and require extensive, specialized medical care. On September 6, 2012, the Children and Parents were present at Parents' home when the back porch area of their residence caught fire. The Children were removed from the care of Parents by the Department of Child Service ("DCS"), after a determination by the fire inspector that items in the house were a drug lab.

[3] On December 7, 2012, the court entered an order adjudicating each of the Children as a child in need of services ("CHINS"). The order noted in part that Parents admitted the Children were CHINS, that police had found items commonly used to cook methamphetamine at Parents' house following the house fire, that D.C. and G.C. have cerebral palsy, and that in February of 2010 Parents had been investigated for medical neglect of D.C. and G.C. because they had not received medical treatment for two years.

[4] Mother agreed to plead guilty in January 2013 to possession of methamphetamine as a class D felony and three counts of neglect of a dependent as class C felonies. She received a sentence of four years with two years suspended and probation, and she was released from incarceration in November 2013. Father agreed to plead guilty in February 2013 to dealing in methamphetamine as a class B felony and three counts of neglect of a dependent as class C felonies. He was sentenced to ten years with five years suspended, his earliest release date is May 14, 2015, and his term of incarceration can be reduced if he completes inpatient drug treatment.

[5] On January 31, 2014, DCS filed petitions for the involuntary termination of the parent-child relationship of Parents and the Children. On June 3, 2014, the court held a fact-finding hearing on the petitions to terminate Parents' parental rights and heard testimony from Parents; a DCS case worker; a police officer who had observed Parents' home and the Children prior to the day of the fire and was present following the fire; a police detective who investigated the fire, recommended that charges be filed, and testified that "I don't come across a situation like this very often where kids are put in this much danger;" a case manager with a licensed child placing agency; a foster parent of G.C.; a foster parent of S.C. who had originally been a foster parent of the Children; a foster parent of D.C.; a DCS family case manager assigned to Parents; a home based therapist; and a guardian ad litem. Transcript at 50. DCS presented evidence that its plan for the Children was adoption. Counsel for Father and DCS filed proposed findings.

[6] On July 28, 2014, the court entered a twenty-three page order of involuntary termination of parental rights, including 256 findings of fact. The order concludes that there is a reasonable probability that the reasons for the Children's placement outside of the home will not be remedied, that termination of the parent-child relationship between Parents and the Children is in the best interests of the Children, and that DCS's plan of continuing placement, placement for adoption, and continuing counseling and medical care for the Children is a satisfactory plan of care and treatment.

## *Discussion*

[7] The issue is whether the findings of the trial court support the termination of parental rights. When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* When reviewing findings of fact and conclusions thereon in a case involving a termination of parental rights, we apply a two-tiered standard of review. *Id.* First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is "clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *Id.*

[8] This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836

(Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.* A trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[9]    In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.,* 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied.* If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *Id.* (citing Ind. Code § 31-35-2-8(a)).

[10] Parents contend that the trial court's findings do not support its judgment that there was a reasonable probability that the reasons for the Children's removal would not be remedied, that termination of the parent-child relationship was in the best interests of the Children, and that there was a satisfactory plan for the care and treatment of the Children. Parents limit their arguments to whether the findings of the trial court support the court's judgment, and they do not assert that the court's findings were not based upon the evidence presented at the fact-finding hearing.

A. *Remedy of Conditions*

[11] The trial court concluded that there is a reasonable probability that, because of Parents' inability to meet the basic needs of the Children and their pattern of being able to complete services but not fully benefit from them, the conditions that resulted in the Children's removal from the home have not and will not be remedied. The court further concluded that there is a reasonable probability that, because of Parents' drug use and incarceration, the reasons for the Children's placement outside of the home will not be remedied.

[12] The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). To determine whether there is a reasonable probability that the conditions which resulted in the removal of the children will not be remedied, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions.

*In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.* "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *Id.* (citation and internal quotation marks omitted). A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* A trial court can reasonably consider the services offered by DCS to the parent and the parent's response to those services. *Id.* Further, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve. *Id.*

[13] Parents argue that the trial court's conclusions are based primarily on their conduct before their arrests and the removal of the Children from their home. They argue that they both admitted to struggling with methamphetamine use for ten to fifteen years, they were using methamphetamine constantly for a few months before their arrest, and that their action after the removal of the Children was more indicative of changed conditions. In support, Parents point to the court's findings that both of them were cooperative with DCS after the Children were removed; that Mother started services when she was released from jail, completed substance abuse treatment, had not tested positive while on

probation, was employed and was working on having her driver's license reinstated; she was making payments on a vehicle and was looking for apartments; and that Father intends to live at his mother's house upon his release from prison and acknowledged he needs to start over with drug classes, obtain a vehicle, and show he can care for the Children. Parents also contend that, although Mother had not yet made enough progress for DCS to recommend reunification, there was no evidence that she had stopped making progress in the six months between her release from incarceration and the termination hearing, and they assert that Father was set to be released from incarceration in a short period of time.

[14] DCS notes that Parents do not challenge any of the court's findings of fact and that the court entered numerous findings related to Mother's drug use for ten years and Father's drug use for fifteen years, the unsanitary condition of Parents' home and presence of drugs and precursors in the home, Parents' incarceration, Parents' neglect of the Children, the Children's medical issues and needs including the specialized care required by D.C. and G.C., Parents' visitation with the Children, and Parents' response to services including that Father was still incarcerated, there was not enough progress on Mother's part to increase visitation, and that DCS remained concerned about Parents' long history of drug use and their ability to care for the Children's medical and daily needs. DCS contends that Parents' argument that the trial court gave too much weight to their prior conduct is a request for this court to reweigh the evidence. DCS also argues that Parents did not take D.C. and G.C. to their medical

appointments and were not meeting their needs, the Children were severely neglected, Parents continued their drug use and increased their dependence to the point of making their own methamphetamine and using it as fast as they could make it, and that the manufacturing posed a direct threat to the Children's safety when the family home caught fire. DCS further argues that Parents have been unable to show they are close to being able to provide the Children with a permanent and stable home environment in light of the Children's significant needs, both a guardian ad litem and family case manager testified that Parents have not reached the point where their ability to parent the Children can be observed and evaluated, Mother admitted she would be unable to care for D.C. and G.C. on her own, Father's earliest release date was May 2015, and that the court found Parents' progress had not been enough to demonstrate their ability to care for the Children. DCS also asserts that the Children's stability is paramount given their medical and emotional needs and that D.C. and G.C. require surgery and face lengthy recoveries and therapy.

[15] To the extent Parents emphasize certain findings of the trial court and claim that the court focused on their conduct prior to the removal of the Children, we will not reweigh the evidence and will consider only the evidence and reasonable inferences most favorable to the judgment. *See Bester*, 839 N.E.2d at 147.

[16] The court entered 256 findings of fact which relate primarily to the nature and severity of Parents' drug use, observations of the condition of the Children's

living conditions, the Children's extensive medical and personal needs, and Parents' neglect of those needs.

[17] The court found that Mother was thirty-four years old and struggled with methamphetamine use for ten years, that for the last few years before her arrest she used all of the time, that Father was thirty-two years old and has had substance abuse issues for fifteen years, and that Parents were manufacturing methamphetamine just to use and not to sell.

[18] The court also found that the Children and Parents were present at Parents' house when the back porch area caught fire, that Mother was cooperative with DCS but was not forthcoming with information, and that all the Children were in the home when methamphetamine was being cooked. The court noted that a police officer observed that the Parents' home was unclean with clothing in piles in different rooms and that it was not easy to move through on the day the Children were detained, the officer observed the Children in the house on a previous occasion and noticed that the boys had special needs and that one boy pulled himself along the floor with his arms, that a video camera pointed onto the outside porch, and that the fire department found precursors to methamphetamine in the kitchen area.

[19] The court further noted that, according to the police detective, a fire inspector believed that items in the house were used as a drug lab, including two plastic bottles, two Coleman camping fuel cans, and a package of coffee filters found near one of the cans. The court found that several items of drug use and

paraphernalia were found in a bedroom closet, that the fire was on the back porch which leads into the kitchen and that the kitchen is accessible to anyone in the house, and that battery casings were also discovered. The court noted the detectives' observations that the home was unkempt, dirty, and in disarray, and found that drug manufacturing is inherently more dangerous than simple drug use, and that it is dangerous to breathe in the fumes.

[20] The court found that Mother pled guilty to possession of methamphetamine and three counts of neglect of a dependent as felonies, she received a sentence of four years with two years suspended, she was released from incarceration in November 2013, she was on probation at the time of the hearing, Father was incarcerated at the time of the hearing, Father is not allowed to reside with Mother once he is released, Father pled guilty to dealing in methamphetamine and three counts of neglect of a dependent as felonies, he was sentenced to ten years with five years suspended, his earliest release date was May 14, 2015, and that his time can be reduced if he completes inpatient drug treatment.

[21] With respect to Parents' neglect of the Children, the court found that Mother admitted the Children were not receiving the attention they needed, Parents had been in trouble for not taking D.C. and G.C. to their medical appointments, D.C. and G.C. have cerebral palsy and have many medical needs, specialized medical care was arranged for D.C. and G.C. at Riley Hospital, D.C. and G.C. needed to go but did not, and that Parents did not have money for those trips or Father would sometimes be gone. The court also found that Parents were involved with DCS in Delaware County for not taking

D.C. and G.C. to medical appointments and that DCS in Wells County did an investigation of Parents' family and it was found that D.C. was unsupervised in the street and that Parents were sleeping while G.C. was responsible for watching D.C. Further, the court found that Father would frequently be gone overnight on roofing jobs for five nights per week, and that he obtained a roofing job because he was unable to pass drug screens at other employment.

[22] Among numerous other findings, the court referenced the facts that D.C. and G.C. had cavities and decayed teeth and were dehydrated and severely malnourished, it had been four years since D.C. had been seen by his physician, D.C. cannot feed himself, and that Mother used to give S.C. sleeping pills. The court noted that DCS looked into relative placement but no family member was willing to keep the Children for longer than a few months, that a case manager visits D.C. and G.C. at least weekly and works with G.C. on expressing emotions, on his hygiene, his education, and his transportation needs to Riley Hospital, that G.C. also sees a counselor who does home-based therapy, that G.C. has been in his placement since January 2013, and that he has been doing really well in his placement.

[23] As to D.C., the court found that he has been with his foster family for almost two years, needs extensive daily care with even the most basic needs, has had and will continue to have many treatments and surgeries for his cerebral palsy, his foster parents are looking at obtaining a ramp for their van, and that all the people in the household care for him.

As for S.C., the court found that she struggles at school with staying on task, following rules, and with self-control, that she is a bright girl and otherwise does well in school, that she has no medical needs except for regular check-ups, that in the beginning S.C. had a hard time sleeping, was not used to a structured bedtime, and was afraid of the dark, and that she does great now. The court also found that a home-based therapist works with G.C. and S.C. regarding anger management, feelings, and their separation from Parents, and that S.C. lives only a few doors from D.C. and sees him often. However, S.C.'s foster parents do not intend to adopt her.

With respect to Parents' contact with the Children, the court found that Mother saw the Children one time per month while at the Wells County Jail but had no visits with them while at Rockville and Madison Correctional Facilities, she wrote letters to the Children during this time, at some time after Mother was released from incarceration visits took place with the Children at the Wells County Library for one hour, and that Father wrote letters to Mother and the Children from jail and prison.

With respect to Mother's situation, she has lived with her foster sister and her family since November 2013, is currently employed and works second shift, pays $200 per month in rent and $100 a week for groceries and other bills, rides with a co-worker to and from work, has not had a driver's license since 2002, has multiple offenses for driving with a suspended license, recently completed a course on substance abuse, has been looking for an apartment with her home-

based worker, and has purchased a vehicle but still needs to pay off a prior electric bill.

[27] Among the court's other findings, in September 2013, a permanency hearing was held and DCS requested time to work with Mother on reunification because she was being released from incarceration. She was released in November 2013 and in February 2013 a permanency plan of reunification was reviewed and was changed to initiation of termination of parental rights proceedings followed by adoption, because, while Mother was participating in services, there was not enough progress to be able to increase visitation or to move any of the Children into her care. The court also found that Father wants to start over with drug classes, have a vehicle, and show he can care for the Children.

[28] Services provided to Mother included home-based therapy, home-maker services, and substance abuse assessments and groups, and she received positive reports. The court found that a goal of DCS is for Mother to find housing, that DCS "could not reunify with [Mother] today," and that, "[e]ven three children together as a unit or separately, [DCS] cannot recommend sending them home. [Mother] has not made enough progress so far." Appellants' Appendix at 127. DCS expressed concerns about past drug usage and what will happen when Father enters Mother's life again, that school occurs during first shift and that child care would be needed during Mother's work hours, that Father has been unavailable so it is difficult to say if he can maintain sobriety, keep up a home

address, and maintain the Children's medical needs and treatments. DCS recommended termination of Parents' parental rights.

[29] The evidence and the court's findings establish that Parents did not meet the needs of the Children, the Children were severely neglected, Parents placed the Children in an unsafe and unsanitary environment, including exposing them to a methamphetamine lab, and that Parents had extensive substance abuse issues which affected their stability and ability to care for the Children. The evidence and the court's findings further show that Parents are not close to being able to provide the Children with a permanent and stable home environment and to provide the attention and care the Children need, and Mother admitted that she was unable to care for D.C. and G.C. on her own. The court expressed its concerns regarding Parents' drug use history, their ability to care for the Children and provide housing and transportation, and what will occur when Father is released from incarceration. The court found that, according to DCS, Mother did not make enough progress to show she could care for the Children together or individually and that the Children had immediate medical and other needs which needed to be addressed right away. The evidence and findings also establish that the Children have improved in almost every area of their lives, including their health conditions and schooling, since their removal from Parents' care and placement in foster homes.

[30] Based upon the court's findings, we conclude that clear and convincing evidence supports the trial court's determination that there was a reasonable probability that the conditions leading to the Children's removal would not be

remedied. *See In re K.T.K.,* 989 N.E.2d 1225, 1234 (Ind. 2013) (holding that the trial court was within its discretion to consider that the first eleven months of the mother's sobriety were spent in prison where she would not have had access to any illegal substances, that the court was within its discretion to disregard the efforts the mother made only shortly before termination and to weigh more heavily the mother's history of conduct prior to those efforts, and that the evidence showed a reasonable probability that the conditions leading to the children's removal from the mother's home would not be remedied).

B. *Best Interests and Satisfactory Plan*

[31] We next consider Parents' assertion that DCS failed to demonstrate that termination of their parental rights was in the Children's best interests and Parents' claim that DCS did not have a satisfactory plan for the care and treatment of the Children. We are mindful that in determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and to the totality of the evidence. *McBride,* 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* This court has previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests.

*A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[32] Further, this court has held that adoption is a satisfactory plan for the care and treatment of a child under the termination of parental rights statute. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009) (citing *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997)). "This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied.*

[33] Based on the totality of the evidence as discussed and set forth in the trial court's order, including the medical conditions and needs of D.C. and G.C., Parents' history of drug use and concerns regarding their ability to obtain an appropriate permanent and stable home environment and care for the Children, the improvement the Children have realized since their foster placements, the recommendation of the DCS family case manager that she could not reunify or recommend to the court to reunify the Children with Mother, and the recommendation of the guardian ad litem that the court move forward with the termination of Parents' parental rights so that DCS could move forward with adoption and permanency for the Children, we conclude that the court's determination that termination was in the Children's best interests is supported by clear and convincing evidence. *See In re J.C.,* 994 N.E.2d 278, 290 (Ind. Ct. App. 2013) (observing that "[r]ecommendations of the case manager . . . in addition to evidence the conditions resulting in removal will not be remedied,

are sufficient to show by clear and convincing evidence that termination is in the child's best interests"), *reh'g denied.* The record also reveals that the court's findings support its conclusion that adoption is a satisfactory plan for the care and treatment of the Children. *See A.J, v. Marion Cnty. Office of Family and Children,* 881 N.E.2d 706, 719 (Ind. Ct. App. 2008) (concluding that, in light of the evidence, the plan for the adoption of the children, albeit in different homes, was not unsatisfactory), *trans. denied.*

### Conclusion

[34] We conclude that the trial court's judgment terminating the parental rights of Parents to the Children is supported by clear and convincing evidence. We find no error and affirm.

[35] Affirmed.

Bailey, J., and Robb, J., concur.